**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 13-22031-CIV-GOLD/GOODMAN**

MYRNA WIELER VELARDE and
FAMEX INVESTMENTS LIMITED,

       Plaintiffs,

v.

HSBC PRIVATE BANK INTERNATIONAL,

       Defendant.

_____/

**ORDER ON DEFENDANT'S**
**MOTION TO STAY PROCEEDINGS**

In their song "The Boxer," Simon & Garfunkel explain that "still a man hears what he wants to hear and disregards the rest."[1] The lead Plaintiff wants the focus of Defendant's motion to stay proceedings to be her revocation of a Cayman Islands trust she created, but seeks to gloss over or ignore other critical factors, such as her lack of authority to transfer funds from the account at the defendant bank she and her co-Plaintiff have sued for failing to honor their transfer requests.

The Defendant, a United States Banking corporation formed under the Edge Act, wants to stay this lawsuit filed against it by the two Plaintiffs. It says a Cayman Islands proceeding will soon decide issues concerning the trust which will have a substantial or

---

[1]     "The Boxer," on Bridge Over Troubled Water (Columbia 1969).

controlling effect on the claims at issue here. Plaintiffs oppose a stay, stressing the revoked status of the trust which indirectly funded the account at the bank.

This dispute over the requested stay is before the Undersigned on the District Court's referral of defendant HSBC Private Bank International's ("the Bank") motion to stay proceedings until a final ruling is issued in the Cayman Islands case ("the CI Proceedings"). [ECF Nos. 14; 21]. Because the motion to stay is not a case-dispositive motion, the Undersigned has authority to issue an order, as opposed to a report and recommendation. *Delta Frangible Ammunition, LLC, v. Sinterfire Inc.*, No. 06-1477, 2008 WL 4540394, at *1 n.1 (W.D. Pa. Oct. 7, 2008); *Simoneaux v. Jolen Operating Co.*, No. 04-2467, 2004 WL 2988506, at *2 (E.D. La. Dec. 15, 2004). Having reviewed the parties' memoranda and submissions, including bank account agreements, bank account opening documentation, and declarations of Cayman Islands law experts, and having held a hearing on the motion,[2] the Undersigned **GRANTS in part and DENIES in part** the Bank's motion.

## I.      FACTUAL BACKGROUND

In June 2009, Plaintiff Myrna Wieler Velarde ("Ms. Wieler"), a citizen of Bolivia and a resident of Argentina, signed an agreement with non-party HSBC International Trustee Limited ("HKIT" or the "Trustee"), a Cayman Islands trust company,

---

[2]      At the hearing, counsel for all parties agreed that an evidentiary hearing is unnecessary to resolve the motion to stay, and no party requested an evidentiary hearing. [ECF No. 32, p. 67].

establishing a Cayman Islands trust under which Ms. Wieler is the settlor and HKIT is the trustee (the "Famex Trust"). [ECF No. 1-2]. At that time, Ms. Wieler was married to Gregorio Navarro Quiroga ("Mr. Navarro"), who was also a Bolivian citizen and resident of Argentina, but they divorced in 2011. By its terms, the Famex Trust is governed by the laws of the Cayman Islands and "all rights under [the Famex Trust] and its construction and effect shall be subject to the jurisdiction of and construed according to the laws of the Cayman Islands." [ECF No. 1-2, p. 12]. The Famex Trust agreement also provides that "[t]he courts of the Cayman Islands shall be the forum of [its] administration." [*Id.*].

The Famex Trust agreement authorizes the Trustee to incorporate one or more "Investment Companies," defined in the Famex Trust agreement as "any company where the directors and officers are supplied or nominated by the Trustees (or some other party related or affiliated to the Trustees)" [*Id.* at p. 5], and it grants the Investment Companies the authority to open accounts and invest the funds/assets of the Famex Trust [*Id.* at p. 14]. As authorized by the Famex Trust agreement, the Trustee formed a Cayman Islands Investment Company -- Famex Investment Limited ("Famex") [ECF No. 1, p. 1] -- and on June 22, 2009 Famex opened a general depository and investment account at the Bank (the "Famex Account"). The Trustee and Lion International Management Limited, a Trustee-affiliated Cayman Islands company

("Lion"), were respectively the sole officers and directors of Famex. [ECF No. 17-1, pp. 6-27].

The Bank is not a trustee of the Famex Trust and **it has no management or control over the Famex Trust, the Trustee or Famex.** Instead, the Bank is a United States banking corporation formed pursuant to the Edge Act, 12 U.S.C. § 611, *et seq.,* and headquartered in Miami, Florida. [ECF No. 14, p. 4]. The documentation establishing and controlling the operation of the Famex Account consists of, *inter alia*, a Client Application and Agreement, Signature Card, list of authorized signers, Famex Agreement/Resolutions, Limited Trading Power of Attorney in favor of Ms. Wieler, and other related account-opening documents. [ECF No. 17-1].

These documents establish that the Bank "may take and act on instructions to transfer funds out of the [Famex] Account or to pledge assets **only** upon the orders/instructions of an authorized Representative who, for purposes of ordering payments out of the [Famex] Account or to pledge assets in the account, could only be a designated signer/employee of the Trustee or [Lion]." [ECF No. 17-1, pp. 3-4].

The account agreements further provide that only the Trustee or a Lion officer is authorized to change existing signature authority for "Representatives" and provide new designations of Representatives. [ECF No. 17-1, pp. 3-4, 18]. The only signers listed on the Famex Account Signature Card are the Trustee and Lion (as set out on an authorized signer form), and the Signature Card provides that the designated signers'

authority remains "until the Bank receives written notice to the contrary" from the Trustee or Lion. [*Id.* at pp. 8-9]. The record establishes that the Bank has not received any written notice from the Trustee or Lion to change or modify the list of "Representatives" or their signing authority. [*Id.* at ¶8]. It has, however, received transfer requests from Ms. Wieler.

Plaintiffs contend that "Ms. Wieler is explicitly listed as a Representative who has the power and authority to act under the agreement/resolution to bind [Famex]." [ECF Nos. 20, p. 7; 33, p. 28]. The express terms of the authorized signer listing for the Famex Account, however, set out the list of "Representatives" and their respective signer authority. As the Bank points out, while Ms. Wieler is listed as a "Representative," that listing expressly *limits* Ms. Wieler's signer authority *"per the LTPOA"* – meaning the Limited Trading Power of Attorney dated June 22, 2009 between Famex and Ms. Wieler. [ECF No. 17-1, p. 19] (emphasis added).

By its terms, the LTPOA authorizes and permits Ms. Wieler only to direct investments *within the Famex Account* -- but not to "initiate withdrawals from or additions to [Famex's] Investment Accounts other than by way of transfer between two Investment Accounts both held in the name of the same Investment Company at the same Account Provider." [ECF No. 17-1, pp. 4, 22].

Significantly, that same section of the LTPOA goes on to provide that Ms. Wieler may not "direct that payments be made to [herself] or any other person (other than in execution or completion of sale, purchase or other transaction for value)." [*Id.*].

Thus, the Famex Account documentation does not designate Ms. Wieler as an authorized signer with power to order transfers of funds *out of the Famex Account* or whose signature is required to pledge the Famex Account.

On October 12, 2010, the Bank loaned $2 million to Fabrica de Fideos Rivoli, S.A. ("Rivoli"), an Argentine corporation represented to the Bank as being owned by Ms. Wieler and two of her children (the "Rivoli Loan") [ECF No. 17-1, pp. 4-5, 28-32], which was secured by a pledge of the Famex Account. As noted above, the Famex Account documentation establishes that a pledge of the Famex Account could be given only by authorized signers from the Trustee or Lion, and the Bank filed a $2 million Guaranty and Security Agreement pledging the Famex Account as security for Rivoli's repayment of all obligations under that loan signed by Representatives from the Trustee. [*Id.* at pp. 4-5, 33-41].[3]

---

[3]     Plaintiffs dispute the authenticity of a separate pledge agreement dated October 4, 2010 [ECF No. 16, p. 5], but have presented nothing of record to support any objection to the authenticity of the October 12, 2010 pledge.

On August 22, 2012, Ms. Wieler's ex-husband -- Mr. Navarro -- filed a Verified Complaint in Florida state court, asserting claims for equitable ownership of, *inter alia*, the assets in the Famex Trust. That lawsuit remains pending.[4]

Although the state court initially granted Mr. Navarro's *ex parte* motion for a temporary injunction, it thereafter summarily dissolved the injunction after Ms. Wieler and her two children filed a motion to dissolve. At the end of a three-day evidentiary hearing on the motion, during which the court took documentary evidence and heard live testimony (including from Mr. Navarro himself) and in-depth arguments on issues that form the crux of that action, on March 6, 2013, the state court judge dissolved the injunction and stated the following:

> Frankly, Mr. Navarro's testimony so totally lacked credibility, that it was a struggle to listen to. It was sad. It was sad. It's a real problem with the Plaintiff's case.
>
> I understand Mr. Navarro was on the witness stand today for, say, two and a half hours, given the breaks this morning and another hour, hour and a half this afternoon. It is not there. I could not, in good conscience, find a substantial likelihood that he would prevail based on his testimony that he owns everything.[5]
>
> \*          \*          \*
>
> On that element, I have to dissolve this injunction.[6]

---

[4]     Mr. Navarro died on July 30, 2013 and, under state law, the state court action is temporarily abated.

[5]     [*See* ECF No. 1-7, p. 2] (transcript excerpt page 435, lines 14-24).

[6]     [*See Id.*] (transcript excerpt page 436, lines 6-7).

*          *          *

I am not going to tie up this money when the credible evidence was so sparse; so sparse. I am not going to continue to tie up this money on an *ex parte* basis.[7]

Mr. Navarro filed a notice of appeal of the lower court's dissolution order on March 7, 2013.

After the temporary injunction was dissolved, Ms. Wieler initiated efforts to transfer funds out of the Famex Account by delivering payment instructions to the Bank bearing only her signature. The Bank did not act on her payment instructions, asserting that she lacked signature authority to order payment out of the Famex Account.

Under its terms, the Famex Trust was revocable and provides that "[t]he Settlor may revoke this Settlement in whole . . . by written instrument delivered to the Trustees, whereupon the Trust Fund . . . shall be beneficially owned by and revested in the Settlor." [ECF No. 1-2, pp. 15-16]. Ms. Wieler initiated the revocation of the Famex Trust and the revocation became effective April 11, 2013 with execution by the Trustee of a Deed of Revocation. As a result of that revocation, Ms. Wieler claims ownership of the Famex Trust assets and, among other things, entitlement to direct the Famex Account.

The Trustee and Ms. Wieler disagreed on the effect of the revocation and the Trustee's obligations. The Trustee sought direction from the Grand Court of the

---

[7]      [*See Id*.] (transcript excerpt page 436, lines 22-25).

Cayman Islands, Financial Services Division (the "Cayman Court"), as to how it should administer the Famex Trust assets and, in particular, how the Trustee should handle the Famex Account in light of existing circumstances, including the adverse claim by Mr. Navarro, the Famex guaranty of the Rivoli Loan (which is in default and unpaid) [ECF No. 1-15, p. 11], and the Trustee's claims of entitlement to indemnification from the Famex Account for liabilities it has incurred in the administration of the Famex Trust pursuant to the terms of the Famex Trust and the Deed of Revocation. [*Id.* at p. 23].

The Trustee brought these issues before the Cayman Court on April 23, 2013 by way of an "Originating Summons," and named both Ms. Wieler and Mr. Navarro as party defendants. [ECF No. 14-1]. Upon service of the CI Proceedings, Ms. Wieler and Mr. Navarro engaged Cayman Islands counsel, appeared, and are participating in the CI Proceedings. The Bank says that Mr. Navarro's estate is expected to continue to participate.

Plaintiffs underscore the voluntary nature of the originating summons in the CI Proceedings, noting that no law -- in either the United States or the Cayman Islands -- *required* the Trustee to pursue the CI Proceedings.

HKIT's Originating Summons requests the following relief from the Cayman Court:

1. Directions as to whether the Trustee should be given leave by the Court to transfer some or all of the assets in the Trust Fund:

a. to the Settlor (Ms. Wieler) in light of her purported revocation of the Trust, notwithstanding the claim asserted by Mr. Navarro in the Florida state court proceedings against Ms. Wieler and others; or

b. to an escrow account in the names of Ms. Wieler and Mr. Navarro subject to suitable access conditions in light of the Florida proceedings; or

c. into the Court pending the resolution of the Florida proceedings.[8]

Additionally, HKIT is seeking direction as to whether it should be given leave to assert a lien over some or all of the assets in the Trust Fund in respect of unpaid fees, expenses, and liabilities properly incurred to date by the Trustee and/or Famex, and to which the Trustee and/or Famex may be contingently exposed, as a result of the due administration of the Trust.

On May 8, 2013, Ms. Wieler submitted another payment instruction to the Bank, instructing it to transfer a total of more than $7 million out of the Famex Account to two accounts -- one held in her name and one in the name of her attorneys. [ECF No. 1-13]. That payment instruction was signed only by Ms. Wieler and not by the authorized signers of the Trustee or Lion, and neither of them has amended the signer authority on the Famex Account or authorized the Bank to make the transfers. Although it acknowledges that the Famex Trust has been revoked, the Bank did not make the transfers and contends that, until it receives payment instructions from an authorized signer on the Famex Account or direction from a court of competent jurisdiction, it

---

[8]        [*See* ECF No. 14-1].

cannot make any transfers under the terms of the Famex Account documents and Florida law.

On July 31, 2013, the Florida Third District Court of Appeal affirmed *per curiam* the state court's dissolution order.[9] On that same date, Mr. Navarro's counsel filed a Suggestion of Death stating that Mr. Navarro passed away on July 30, 2013. Pursuant to Florida Rule of Civil Procedure 1.260(a), Mr. Navarro's successors or representatives must file a motion for substitution within 90 days after the death is suggested.[10]

Ms. Wieler filed her affidavit evidence in response to the Trustee's Originating Summons on June 24, 2013. On July 2, 2013, Mr. Navarro filed a summons and application to the Cayman Court seeking an extension of time until August 30, 2013 (a nine-week delay) to file his affidavit evidence in response to the Originating Summons. That application was set to be heard by the Cayman Court on July 31, 2013. At the hearing, Mr. Navarro's attorneys advised the Cayman Court that Mr. Navarro had passed away on July 30, 2013. The Cayman Court adjourned the application, which was relisted for August 29, 2013, to allow a short amount of time for instructions to be taken and for a number of issues to hopefully be addressed, including (i) whether a personal representative had been appointed and (ii) whether the personal representative on

---

[9]     *See Quiroga v. Velarde*, 117 So. 3d 1100 (Fla. 3d DCA 2013).

[10]    Although Mr. Navarro's counsel has indicated that his representatives fully intend on continuing to pursue Mr. Navarro's claims, no one has advised the Undersigned that a motion for substitution has been filed in the state court litigation as of the date of this Order.

examining the position wished to and saw any merit in continuing to be involved in the action.

On August 27, 2013, two days before the scheduled August 29 hearing, Mr. Navarro's counsel served on the Cayman Court and all parties correspondence and an Affidavit of Juan Pablo Navarro Wieler ("Juan Pablo"), who is Mr. Navarro's son. In that affidavit, Juan Pablo asserts, *inter alia*, that (i) on January 24, 2013, Mr. Navarro signed and notarized a will where he designated Juan Pablo's brother, Carlos Navarro Wieler, and Juan Pablo to be the Personal Representatives of his Estate, and (ii) that Juan Pablo, as the representative of his father's estate, intends to pursue and continue the Florida state court proceedings. Additionally, Juan Pablo requested that the Cayman Court stay the August 29, 2013 hearing on Mr. Navarro's initial application for an extension of time so that Juan Pablo could "put proper expert evidence before the Grand Court regarding the legal position of Bolivia in relation to the equivalent grant of probate and in order that the personal representatives of Mr. Navarro's estate might properly be substituted as Defendants to the Cayman Islands proceedings." Juan Pablo failed to advise the Court how much time it would take for these actions, thereby requesting an apparently indefinite stay.

At the hearing on August 29, 2013, Mr. Navarro's counsel informed the Cayman Court that they presently had no instructions to act for the executors or personal representatives of Mr. Navarro's estate, and based on the circumstances and for the

reasons referred to in Juan Pablo's affidavit, sought a further adjournment of the action. The Cayman Court indicated that it considered that the Originating Summons brought by the Trustee was a matter between the Trustee and the Court, and although it might be useful to hear from counsel for both Ms. Wieler and Mr. Navarro's estate, it would not unnecessarily delay the hearing of the Originating Summons. The Cayman Court considered the application brought by the Trustee for advice and directions not to be contentious, and outlined that the Originating Summons should be heard and that the Court should provide its advice and directions as appropriate and that if Ms. Wieler or Mr. Navarro were not content with the advice and direction that will be given by the Court they should then issue their own proceedings for such relief as may be deemed appropriate. As a result, the Cayman Court ordered that the Originating Summons should be listed for a date not earlier than four weeks from the date of its order and convenient to all parties, including Mr. Navarro's former counsel. That date has been set as October 14, 2013.

## II.     PROCEDURAL BACKGROUND

On June 5, 2013, Ms. Wieler, individually -- and purportedly on behalf of Famex[11] -- filed a four-count complaint against the Bank. Count I of the complaint asserts a

---

[11]     The Bank contests Ms. Wieler's authority to direct action by or on behalf of Famex, asserting that authority belongs to its officers and directors, respectively the Trustee and Lion, and that there is nothing of record establishing that either has authorized the filing of the complaint by Famex. Resolution of that issue is not

breach of contract claim for "wrongfully withholding funds" because the Bank has "repeatedly refused to comply with [Ms. Wieler's] requests and instructions." Counts III and IV assert, respectively, conversion and unjust enrichment claims based on this same dishonor of payment orders Ms. Wieler signed. Count II asserts a claim for "misuse" of funds in the Famex Account by allowing the Famex Account to be pledged (to secure repayment of the loan to Rivoli) without Ms. Wieler's agreement.

Rather than answer the complaint, the Bank filed a motion to stay, claiming that the CI Proceedings will soon decide issues -- such as the Trustee's request for direction as to the effect of the revocation of the Famex Trust and the Trustee's rights and obligations under the revoked trust, and, specifically, what action the Trustee should take with regard to the Famex Trust assets, including the Famex Account -- which will have a substantial or controlling effect on the claims at issue in this case. [ECF No. 14]. After responses, replies, and sur-replies were filed [ECF Nos. 16; 17; 20], the Undersigned held a hearing on the Bank's motion on August 16, 2013. [ECF No. 29].

At the hearing, the Bank's counsel stated that the Bank is seeking a stay of this case pending the Cayman Court's resolution of the CI Proceedings (but not any subsequent appeal), and suggested that those proceedings were expected to be resolved within months. Plaintiffs questioned that timeline and raised issues that Plaintiffs asserted could lengthen the anticipated resolution time. At the hearing, the

necessary to resolve the Motion to Stay, and the Undersigned therefore will not address it here.

Undersigned directed the parties to each file declarations from experts in the law and procedure of the Cayman Islands applicable to the CI Proceedings and the anticipated deadlines given the claims raised and all related circumstances. The parties each submitted a declaration from an attorney who provided opinions and predictions as a Cayman Islands law expert. [ECF Nos. 34; 35; 35-1].

The Bank submitted a sworn declaration from an English barrister who specializes in trusts and is also a member of the Cayman Islands Bar, stating that the judge presiding over the CI Proceedings will likely issue a ruling at the October 14, 2013 hearing, or if not at the hearing, then shortly thereafter. [ECF No. 35-1, pp. 1-2, 7]. If that does not occur, then the barrister predicts it is "highly probable" that there will be a final ruling within six months of the October 14, 2013 hearing. [*Id.* at p. 7].

The Plaintiffs submitted a sworn declaration from the Cayman Islands attorney representing Ms. Wieler, and who is now named as a defendant in the CI Proceedings filed by the Trustee which formed Famex.[12] [ECF No 34]. Plaintiffs' expert generally agreed with the Bank's expert as to the procedural status, but opined that the Cayman Islands judge is *unlikely* to issue a ruling and judgment at or immediately after the October 14, 2013 hearing. [*Id.* at pp. 6-7]. Instead, according to Plaintiffs' expert, the judge will reserve ruling at the conclusion of the hearing and likely rule two to three

---

[12]     Famex, in turn, opened an account at the Bank with trust money.

months thereafter. [*Id*.].[13] Thus, Plaintiffs' expert predicts that the CI Proceedings may well yield a ruling *sooner* than the prediction offered by the Bank's expert.[14]

## III.    LEGAL STANDARD

A district court is empowered to stay its own proceedings for purposes of conserving judicial resources and efficiently handling duplicative actions. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Ortega Trujillo v. Conover & Co. Commc'ns, Inc.*, 221 F.3d 1262, 1264 (11th Cir. 2000); *see also In re Braga*, 789 F. Supp. 2d 1294, 1307 (S.D. Fla. 2011). This authority extends to issuing a stay of its own proceedings pending the resolution

---

[13]    In his declaration, Plaintiffs' expert purports to render an opinion that the legal issues pertaining to Count II in the instant complaint will not be resolved by the judgment in the CI Proceedings.  Even if correct, that opinion is not dispositive. If three of the four counts will be substantially affected by the anticipated ruling in the CI Proceedings, then it would be impractical and inefficient to temporarily stay most of the counts but permit one sole count to continue. *Groom v. Bank of Am.*, No. 8:08-CV-2567-T-27EAJ, 2010 WL 627564, at *2-3 (M.D. Fla. Feb. 23, 2010) (adopting and approving magistrate judge's report and recommendations granting defendant's motion to stay entire class action case and rejecting plaintiff's suggestion that a partial stay be entered instead as to a subset of plaintiffs, because doing so would lead to procedural, discovery, and case management hurdles "that need not be injected into the case").

[14]    In their opposition to the Bank's motion to stay proceedings [ECF No. 16, p. 9], Plaintiffs alleged that "the improper activity at the crux of this action preventing Ms. Wieler from accessing her funds is being orchestrated by HSBC IPB Miami personnel and employees in Miami, Florida." Asked at the hearing to specify the type of improper activity Plaintiffs have accused the Bank's officials and employees of engaging in, Plaintiffs' counsel said that the Bank is "ignoring legitimate wire instructions that have been properly issued by Ms. Wieler knowing that she had authority and a right to submit those instructions as given to the bank." [ECF No. 32, p. 40]. If Ms. Wieler did not have authority to demand that funds be transferred out of the Famex Account, then this allegation would be incorrect. Presumably, the judge in the CI Proceedings will decide this issue of whether Ms. Wieler had the requisite authority.

of a foreign action. *Ortega Trujillo*, 221 F.3d at 1264 (observing that "[a] variety of circumstances may justify a district court stay pending the resolution of a related case in [a foreign] court," that "[a] stay is sometimes authorized simply as a means of controlling the district court's docket and of managing cases before the district court," and that, "in some cases, a stay might be authorized also by principles of abstention"); *see also In re Braga*, 789 F. Supp. 2d at 1308; *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1222 (11th Cir. 1999); *Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518 (11th Cir. 1994).

The parties agree that the relevant considerations for determining whether to stay a domestic action pending resolution of a foreign proceeding are set forth in *Turner*: (1) international comity; (2) fairness to litigants; and (3) the efficient use of scarce judicial resources. *Turner*, 25 F.3d at 1518. These principles are derived from an international abstention analysis, but as noted in *Turner*, the principles may support a stay even where they do not support dismissal of an action through abstention. *Id.* at 1523.[15]

Similarly, the Eleventh Circuit in *Posner* recognized that the *Turner* factors apply **even where there has been no judgment in the foreign suit**. *Posner*, 178 F.3d at 1223-24. The critical question is whether the foreign proceeding is "likely to have a

---

[15]    In *Turner,* the Eleventh Circuit vacated a preliminary injunction and remanded the case to the district court with instructions to stay the American action (brought by an American licensor of television programming against a German distributor and broadcasters) pending conclusion of parallel German litigation.

substantial or controlling effect on the claims and issues in the stayed case." *Miccosukee*

*Tribe of Indians of Fla. v. S. Fla. Water Mgmt. Dist.*, 559 F.3d 1191, 1198 (11th Cir. 2009);

*accord In re Braga*, 789 F. Supp. 2d at 1319.

## IV.    ANALYSIS

For the reasons outlined below, the Undersigned hereby imposes a limited-

duration stay. The case will be stayed until the Cayman Court issues a ruling on the

issues pending before it, *or* until December 13, 2013, whichever is **earlier.** The stay will

**automatically expire** upon a ruling from the Cayman Court or upon the lack of a ruling

by December 13, 2013. The Bank has expressly noted that it is *not* seeking a stay through

the pendency of any appeal or challenge to the Cayman Court's ruling, and this Order

is not in any way affected by the status of any appeal to the anticipated ruling by the

Cayman Court.

### A.    International Comity

International comity is founded in "a proper level of respect for the acts of our

fellow sovereign nations," and applies regardless of whether a judgment has been

entered in the foreign action. *Posner*, 178 F.3d at 1223-24. Considerations of international

comity include whether the foreign court is "competent to hear the claims or would . . .

use fair and just proceedings in deciding the case." *Id.* at 1224. Also relevant to the

comity analysis is whether the underlying documents are subject to choice of forum or

law clauses providing for jurisdiction in a foreign court, the strengths of the domestic

18

and foreign interests, and whether the "central question . . . requires a thorough knowledge of [foreign] law." *Turner*, 25 F.3d at 1521. Other *Turner* factors -- *e.g.*, whether the *judgment* was rendered via fraud -- facially do not apply to cases, such as the instant case, where there has been no foreign judgment. [*See* ECF No. 16, p. 7].

      This factor supports the requested stay because (1) the Famex Trust agreement has a Cayman Islands forum provision, (2) Cayman Islands law is the applicable law governing the trust and the management of Famex, (3) the Cayman Islands Court is competent to hear the claims before it, and (4) neither party has alleged that the CI Proceedings would be unfair.[16] By entering into the Famex Trust agreement, Ms. Wieler expressly agreed that "all rights under [the Trust] and its construction and effect shall be subject to the jurisdiction of and construed according to the laws of the Cayman Islands," and that the courts of the Cayman Islands would be the exclusive jurisdiction for such disputes. [ECF No. 1-2, p. 12].

      Nevertheless, Plaintiffs contend that Cayman Islands law no longer applies because the Famex Trust has been revoked, and they highlight the fact that Florida law governs the relationship between the Bank and its account holder. [ECF No. 16, p. 9]. Plaintiffs also argue that a provision in the Famex Trust -- Clause 3.1 -- controls the outcome here. Clause 3.1 provides, in pertinent part, that after Ms. Wieler revokes the

---

[16]     The Bank's expert has informed that the presiding judge in the CI Proceedings is "a long-standing and very experienced permanent Judge of the Grand Court" [ECF No. 35-1, p. 4], and Plaintiffs' expert does not opine otherwise.

Trust, the "Trust Fund (or the relevant part of the Trust Fund, as the case may be) shall be beneficially owned and revested in the Settlor." Because Ms. Wieler is the Settlor, Plaintiffs say, the Trust Fund assets all revert to her as owner, and, she has the right to control the funds in the Famex Account.

The trust revocation does not control the analysis, however.

While there is no dispute that the Famex Trust has been revoked, the *effect of the revocation* on the rights and obligations of the Trustee and the relationship between the Trustee and Ms. Wieler is governed by Cayman Islands law; the Famex Trust agreement provides that "all rights under [the Famex Trust] and its construction and effect are subject to the jurisdiction of and construed according to the laws of the Cayman Islands." [ECF No. 1-2, p. 12]. Revocation of the Famex Trust does not divest the Cayman Court of jurisdiction over the Trustee's petition for instruction at issue in the CI Proceedings, because the dispute is dependent upon the "construction and effect" of the Famex Trust agreement.

Although the parties also agree that claims by the "account holder" against the Bank are properly brought in Florida under Florida law, there is no dispute that the owner of the Famex Account at the Bank is **Famex**, and whether Ms. Wieler has the right to control Famex under the circumstances is an issue of Cayman Islands, not Florida, law. These issues -- the effect of the revocation of the Famex Trust, and whether Ms. Wieler is entitled, post-revocation, to control the assets in the Famex Account and

to direct the Bank's action with regard to the Famex Account -- are central questions underlying each of Ms. Wieler's claims here, and the rulings of the Cayman Court are likely to have a substantial and controlling impact on this action.

Quoting *CAE, USA, Incorporated v. XL Insurance Company Limited*,[17] Plaintiffs suggest that "*some courts* consider the principles of international abstention in light of a general rule that federal courts should assume jurisdiction [in] parallel proceedings until a judgment is reached in one court." To the extent Plaintiffs are relying on this opinion to argue that this Court may not stay a pending proceeding in favor of a foreign action where no judgment has been entered in the foreign action, Plaintiffs are wrong as a matter of law. *Posner*, 178 F.3d at 1223-24 ("[a]lthough this case is different from *Turner* in that the German dispute had come to judgment – and by contrast little progress has been made here in the Bermuda action – the same principles expressed in *Turner* govern here"); *In re Braga*, 789 F. Supp. 2d at 1308 ("[a] stay is particularly appropriate where the United States is awaiting a potentially dispositive ruling from a foreign court").

Relying further upon *CAE*, Plaintiffs also suggest that a stay is not warranted because this Court is capable of applying Cayman Islands law. [ECF No. 16, p. 8]. This Court's ability to apply Cayman Islands law is not in dispute [ECF No. 17, pp. 8-9]; but that point in *CAE* is not material here because Ms. Wieler expressly agreed that "the

---

[17]     No. 8:11-CV-64-T-24 TBM, 2011 WL 1878160, at *4 (M.D. Fla. May 16, 2011).

Courts of the Cayman Islands shall be the forum for the administration of [the Trust]."
[ECF No. 1-2, p. 12]. Moreover, there can be no dispute that this Court would have to
devote time and effort to ascertain the law of the Cayman Islands – time and effort that
the Cayman Court will not need to expend (because it is already familiar with the law
there).

In addition, Plaintiffs' primary argument -- that Ms. Wieler owns all the funds in
the Famex Account at the Bank because she revoked the Trust and now owns all of its
assets through automatic reversion to the Settlor -- does not address another significant
post-revocation issue regarding those assets, namely, whether the Bank may hold back
funds to secure the $2 million loan and to otherwise indemnify it.

It may well be that Ms. Wieler is correct, and that she is now the undisputed
beneficial owner of all Trust assets, including the Famex Account at the Bank. But a
Cayman Islands judge will presumably decide that issue, and others, in the CI
Proceedings. But, as noted, her theory does not adequately address the fact that she is
not an authorized representative on the account for funds transfer purposes, nor does it
take into account the Bank's competing claims to some of the funds in the account.

### B.     Fairness to Litigants

The three fairness to litigant considerations are: (1) the order in which the suits
were filed; (2) the convenience of the fora; and (3) the possibility of prejudice in the

foreign forum to the party opposing the stay. *Turner*, 25 F.3d at 1522. This factor also weighs in favor of a stay.

The CI Proceedings were commenced by Originating Summons on April 23, 2013, more than a month *before* the filing of the instant complaint and nearly two months before service of the summons on the Bank. Concerning convenience of the fora, Ms. Wieler is a Bolivian citizen residing in Argentina who has consented in the Famex Trust agreement to the Cayman Islands forum for disputes arising under the Famex Trust, and she has appeared in the CI Proceedings.

Before staying a federal lawsuit, a district court should be "satisfied that its decision will not result in prejudice to the party opposing the stay." *Turner*, 25 F.3d at 1522. Plaintiffs have failed to present any support for "prejudice" and concede that the Cayman Court "would be a competent and capable one." [ECF No. 16, p. 11]. Instead, asserting they will be prejudiced by delay in obtaining access to the Famex Account, they express concern as to possible delay.

This concern is obviated by the Cayman Islands experts' declarations, explanations, and opinions as to the anticipated time for completion of the CI Proceedings. In the event unexpected delays occur in the resolution of the CI Proceedings, Plaintiffs will not be unduly prejudiced, as the stay will automatically expire on December 13, 2013.

Nothing in the parties' submissions indicates that Plaintiffs would not have an ample opportunity in the CI Proceedings to fully litigate the relevant issues. Plaintiffs' reliance on *King v. Cessna Aircraft Company*, 505 F.3d 1160 (11th Cir. 2007), which they cite in their Notice of Filing Supplemental Authority [ECF No. 25, p. 1], is entirely inapposite because the opposing party there was "put out of court indefinitely" and the court emphasized that "there is no indication . . . whether [the plaintiff] will have a meaningful opportunity to participate in those proceedings." *Id*. at 1169, 1773. Here, the record is undisputed that Ms. Wieler agreed to a Cayman Islands forum and she has appeared and is participating in the CI Proceedings.

Plaintiffs contend that the account opening documentation militates against a stay. They note that the documents created by the Bank provide that any actions "may be commenced only in Florida state or federal court in Miami Dade County," and that the provisions concerning jurisdiction also provide that each party "waives any objection it may have to jurisdiction or venue in such court or any objection or defense of inconvenient forum in such court." [ECF No. 17-1, p. 18].

But these arguments, while correct, miss the mark. The Bank is not contending that Plaintiffs' lawsuit was improperly filed in Miami federal district court. Likewise, it is not contending that this Court lacks jurisdiction over the lawsuit or the parties. Instead, it is merely asking for a temporary stay (of a lawsuit properly filed in Miami federal district court) until there is a ruling in the CI Proceedings. Thus, Plaintiffs'

24

arguments, factually correct as they may be, are legally irrelevant for purposes of deciding the motion to stay.

Although the Bank has not contested Plaintiffs' point that the Trustee was not *required* to file the CI Proceedings, Plaintiffs have not proffered any legal authority holding that the *Turner* assessment is in any way different if the foreign proceeding is a voluntary one, as opposed to a mandatory one. Thus, the Undersigned is again confronted with an undisputed fact -- i.e., the CI Proceedings were not required -- which appears to have no legal relevance to the motion to stay.

### C.   Judicial Efficiency

The final factor under the *Turner* analysis is "judicial efficiency," and relevant considerations include: (1) the inconvenience of the federal forum; (2) the desirability of avoiding piecemeal litigation; (3) commonality of parties and issues; and (4) whether the foreign forum is likely to render a prompt disposition. *Turner*, 25 F.3d at 1522.

However, of paramount importance is that, barring procedural limitations, a request for a stay should be granted where the decision in the foreign proceeding is "likely to have a substantial or controlling effect on the claims and issues in the stayed case." *Miccosukee Tribe of Indians of Fla. v. S. Fla. Water Mgmt. Dist.*, 559 F.3d 1191, 1198 (11th Cir. 2009) ("the reason for the district court's stay was at least a good one, if not an excellent one" where the decision in the other proceeding was "likely to have a

substantial or controlling effect on the claims and issues in the stayed case"); *see also In re Braga*, 789 F. Supp. 2d at 1310.

The convenience of the federal forum is neutral -- the federal forum is not inconvenient; however, Ms. Wieler has consented to the Cayman Islands forum as to disputes arising under the Famex Trust and has already appeared and is participating in the CI Proceedings.

Concerning the desirability of avoiding piecemeal litigation and the commonality of the parties and issues, those considerations weigh strongly in favor of a stay. The determinations of the Cayman Court, as a matter of Cayman Islands law, in the CI Proceedings will likely have a substantial or controlling effect on the claims and issues here and a stay will avoid potentially inconsistent rulings on Cayman Islands law issues.

As to "commonality," identity of the two actions is not required; the key inquiry is whether they "involve significantly common issues and parties." *Posner*, 178 F.3d at 1224. The parties who claim the right to control Famex and the Famex Account are parties in the CI Proceedings. The issue of the right to control the Famex Account and, more specifically, the effect of the revocation of the Famex Trust, is before the Cayman Court and is the issue underlying each of Plaintiffs' claims in this action. Allowing this case to proceed while the CI Proceedings are pending would endorse piecemeal litigation and put the parties at significant risk of inconsistent judgments.

The final consideration -- whether the foreign court is likely to render a prompt disposition -- has been addressed at length by the expert declarations. The Undersigned finds there is no substantive dispute that the judgment in the CI Proceedings will likely be rendered within 6 months. The Bank's expert opines that final disposition of the CI Proceedings is "highly probable" within six months -- and quite possibly at or shortly after the October 14, 2013 hearing. She has also opined that, although Mr. Navarro died while those proceedings were pending, the presiding Cayman Court judge has indicated that he "intends to give directions to the Trustee on [October 14, 2013] and that the presence or absence of [Mr. Navarro] is unlikely to prevent him doing so," particularly because "[e]xtensive evidence" has already been filed. [ECF No. 35-1, pp. 4-6]. Plaintiffs' expert does not dispute this timeline, and in fact predicts a result within a *shorter* time (*i.e.*, 2-3 months).

Plaintiffs will be able to resume their litigation by December 13, 2013, if not earlier. Until then, they will need to heed the advice provided by Guns N' Roses: "All we need is just a little patience / Patience, patience, patience."[18]

## V.    CONCLUSION

The Bank's motion is **granted**, in part. This case shall be **stayed** until the Cayman Court issues a ruling on the pending issues in the CI Proceedings, or on December 13,

---

[18]    "Patience," on G N' R Lies (Geffen 1988).

2013, whichever is earlier. The stay will automatically end upon the issuance of a ruling resolving the questions posed by the Trustee in the CI Proceedings, or on December 13, 2013.

      **DONE AND ORDERED** in Chambers, in Miami, Florida, October 7, 2013.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
The Honorable Alan S. Gold
All counsel of record